RECEIVED
USDC CLERK, CHARLESTON, SC

In the District Court of the United States
For The District of South Carolina
BEAUFORT DIVISION

2007 DEC -5 P 2: 48

| | | |
|---|---|---|
| KAREN McLACHLAN, | ) | |
| | ) | Civil Action No. 9:06-2731-RBH-GCK |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | **OF THE MAGISTRATE JUDGE** |
| Commissioner of Social Security[1], | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. INTRODUCTION

This case is before the Court pursuant to Local Civil Rule 83.VII.02(A), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636©). The plaintiff, Karen McLachlan (the "Plaintiff" or "Claimant"), brought this action for Disability Insurance Benefits ("DIB") pursuant to Sections 216 and 223 of the Social Security Act, as amended 42 U.S.C. §§ 416(I)--423 (the "Act"), and for Supplemental Security Income ("SSI") under sections 1602 and 1614(a)(3)(A) of Title XVI of the Act, 42 U.S.C, § 1381a, to obtain judicial review of a final decision of the Commissioner of Social

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Commissioner Jo Anne B. Barnhart as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Security denying her claims for DIB and SSI benefits under Titles II and XVI of the Social

Security Act, respectively.[2]

## II.  BACKGROUND TO CLAIM

### A.  Introduction

Plaintiff was born on April 14, 1956, and was 45 years old at the time she alleged

disability, as of December 8, 2001, due to fibromyalgia,[3] chronic myofascial pain disorder,

---

[2]  The Social Security Act comprises two disability benefits programs.  The Social Security Disability Insurance Program, established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides Disability Insurance Benefits ("DIB") to disabled persons who have contributed to the program while employed.  The Supplemental Security Income Program ("SSI"), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons.  The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (DIB); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical.  See Bowen v. City of New York, 476 U.S. 467, 469-470 (1986).

[3]  According to Attorneys Medical Deskbook 3d § 20:6.2 (2002):

Fibromyalgia is a disorder of unknown cause that usually affects females between the ages of 20 and 50 years.  It is very common and affects approximately 2 to 3% of the population.  The American College of Rheumatology formally identified fibromyalgia as a disease in 1990, and issued diagnostic criteria for it.  These criteria are:

1. At least three months of chronic widespread muscular pain. The pain must be present above and below the diaphragm, and on both sides of the body.
2. Painful tender points at no less than 11 of 18 characteristic locations on the body. "Tender points" cause pain only under the place where pressure is applied, whereas "trigger points" seen with other disorders usually produce referred or radiating pain that causes a sharp withdrawal reaction.

Fibromyalgia produces no clinical signs (such as swelling or inflammation of joints), and produces no abnormal x-ray or laboratory findings. The presence of any objective findings indicates a disease process other than fibromyalgia.

The pain may be diffuse, and may be described by the patient as having a burning, stinging, aching, or cramping quality.  The pain is sometimes characterized as unbearable and worse than arthritis pain.  Usually, there was no specific event or trauma that seemed to trigger the onset of fibromyalgia.  Other typical symptoms are:

1. There is severe chronic fatigue that is aggravated by any exertion.
2. The most frequent pain tends to occur in the neck, shoulders, low back, and hips.
3. The pain is aggravated by any mild exertion, and can interfere with activities of daily living.
4. The pain is aggravated by fatigue.
5. The pain is aggravated by psychological stress.
6. The pain is aggravated in certain patients by changes in the weather.

degenerative disc disease, neural encroachment and spurring in her cervical spine, and lumbar

facet disease. (Tr. 69) Plaintiff alleges that the fibromyalgia and degenerative disc disease cause

her to experience chronic, severe pain in the neck, shoulders, arms, elbows, hands, fingers,

muscles, feet, knees and low back, severe fatigue, lack of energy, impaired concentration and

memory, impaired cognition and depression.

Plaintiff has a high school education and received additional education and training as a

cardiac monitor technician. She has worked in the past primarily as a cardiac care technician

(Tr. 80, 85, 90, 93, 120) and also as a bartender and a cocktail waitress. (Tr. 90) Plaintiff last

worked on December 8, 2001, at Providence Hospital. She stopped work due to severe pain,

difficulty lifting patients' charts and impairment in her ability to concentrate on her job and

perform the essential job functions. She received three months of disability insurance payments

from the Hospital.[4]

Plaintiff no longer drives. In 2004, when Plaintiff's driver's license required renewal,

she chose not to renew the license because she was having difficulty driving due to the effects of

the pain medications she was taking, cognitive problems, and trouble holding her arms on the

steering wheel due to the pain from the fibromyalgia. Her daughter or husband drive her to

appointments.[5]

---

7. The pain is present at night, causing insomnia and contributing to the chronic fatigue.
8. There is subjective stiffness of joints, especially in the morning, but no reduction in range of motion.
9. There are chronic headaches.
10. There is subjective numbness.
11. Irritable bowel syndrome causing recurrent diarrhea may be present.

[4]    Plaintiff's Brief at 2.

[5]    Plaintiff's Brief at 2-3.

**B.  Documentary Evidence Before the Administrative Law Judge**

Plaintiff was diagnosed with fibromyalgia in 1999 by Dr. James Fant, a rheumatologist. (Tr. 327-330)  Upon examination, Plaintiff had "tender points mildly positive in classic fibromyalgia areas."  Dr. Fant's impression was "probably fibromyalgia syndrome as evidenced by [patient history] of chronic diffuse pain with assoc tender points by exam, [history of] nonrestorative sleep; depression, anxiety[.]"  Plaintiff had taken Celexa, Prozac, Paxil, Effexor and Wellbutrin for depression and at that time was taking Elavil (an anti-depressant) and Ultram (for pain).  (Tr. 327-330)

On November 15, 2000, Plaintiff underwent a cervical MRI which showed posterior spondylotic[6] changes, particularly at C3-4, C4-5, C5-6 and C6-7; with mild spurs into left C4-5, C5-6 and C6-7.  (Tr. 157, 306)

On December 1, 2000, Plaintiff presented to Tallulah F. Holmstrom, M.D. with complaints of headaches, fatigue, insomnia, and neck pain.  (Tr. 186)  On December 21, 2000, her arthritic blood tests were considered to be "borderline," and she continued to complain of experiencing fibromyalgia symptoms.  (Tr. 182)  On January 19, 2001, Plaintiff complained that her prescribed medication was not working; however, she had no tenderness to vertebral body palpation and complained of feeling fatigued.  (Tr. 181)  On February 16, 2001, Plaintiff indicated that she was unable to "tolerate" Zyprexa, Neurontin and Flexeril and she complained of fatigue, muscle stiffness, aches and pains.  (Tr. 180)  Dr. Holmstrom noted that Plaintiff had "some degree" of depression, and opined that Plaintiff was also experiencing some "family concerns".  (Tr. 180)

---

[6]    Spondylosis is osteoarthritis of the pine and degeneration of the vertebrae.

Plaintiff presented to the Kershaw County Medical Center (Kershaw) on February 21, 2000, with complaints of dizziness and double vision. (Tr. 146) A CT of Plaintiff's head was normal (Tr. 148), and she was discharged with instructions to follow-up with her family physician. (Tr. 147) An MRI of Plaintiff's cervical spine taken on November 15, 2000, showed normal vertebral body height and alignment, some posterior spondylotic changes, no spinal stenosis, and some "mild" spurring (Tr. 157).

On May 7, 2001, Dr. Holmstrom indicated that Plaintiff was "actually seeing a [mental health] counselor" which was "an excellent intervention for her" (Tr. 179). On May 17, 2001, Plaintiff complained of having a severe headache and pain under her left scapula, as well as sinus congestion (Tr. 178, 183).

On November 1, 2001, Plaintiff was seen at Kershaw with complaints of pain throughout her body. (Tr. 322) Following examination, Thomas E. Brandt, Jr., D.O., opined that Plaintiff had myofascial pain syndrome or fibromyalgia, ordered blood tests, and prescribed a course of aquatic physical therapy. (Tr. 322-323) On December 11, 2001, Dr. Brandt noted that Plaintiff had multiple somatic complaints and generalized body pain, which he characterized as myofascial pain syndrome. (Tr. 320) He also noted that the rheumatoid studies had been completed, which were essentially negative. (Tr. 320) Dr. Brandt opined that Plaintiff suffered from a "significant amount of depression and anxiety [which caused] significant amplification of her pain, and may be a significant factor in her overall pain picture". (Tr. 320) He excused Plaintiff from work for a period of two days. (Tr. 321)

Plaintiff continued to complain of pain and fatigue on January 11, 2002 (Tr. 317). Dr. Brandt noted that Plaintiff had still not made an appointment with a neurologist as instructed

and that she had cancelled numerous appointments for a psychiatric evaluation, to the point where the psychologist now refused to see her (Tr. 318). Plaintiff indicated that she had not worked for the past two months (Tr. 317), and Dr. Brandt indicated that he was approving short-term disability pending the completion of consultative examinations (Tr. 318). Plaintiff was to return in four-six weeks (Tr. 318), but there is no record that she did so.

Plaintiff underwent a neurological examination on February 4, 2002, conducted by Charles G. Shissias, M.D., of the South Carolina Neurological Clinic (Tr. 160-161). Examination revealed appropriate attention and concentration; normal memory; 5/5 strength in all extremities; "mild" weakness on exertion for right elbow extension, but 5/5 with full effort; 5/5 bilateral grip strength; "some" right shoulder and neck pain on exertion; and several "tender points" on Plaintiff's arms and legs. (Tr. 160) Dr. Shissias' impression was that Plaintiff suffered from fibromyalgia, migraine headaches without aura and depression. (Tr. 160). Dr. Shissias prescribed medication and instructed Plaintiff to return in six to eight weeks. (Tr. 160-161), but there is no record that she did so.

Plaintiff rescheduled her February 21, 2002 appointment with Dr. Holmstrom to March 4, 2002, but missed that appointment as well as an appointment on March 22, 2002. (Tr. 184) On April 3, 2002, and June 11, 2002, Plaintiff complained only of a sinus infection (Tr. 183).

On October 14, 2002, Dr. Holmstrom completed an assessment of physical abilities form in which she opined Plaintiff could stand for 1 hour at a time for a total of 2 hours per day; walk for 1 hour at a time for a total of 2 hours per day; sit for 1 hour at a time for a total of 2 hours per day; and drive for 2 hours at a time for a total of 4 hours per day. (Tr. 169) Dr. Holmstrom also indicated that Plaintiff could frequently lift up to 5 pounds and occasionally lift up to 10 pounds.

(Tr. 169) Dr. Holmstrom also completed a "Mental Status Supplemental Questionnaire," in which she opined that Plaintiff suffered from fibromyalgia and mental confusion as a result of her medication (Tr. 170). In a mental "Functional Capacities Evaluation" form, Dr. Holmstrom indicated that Plaintiff had moderate impairments in her ability to relate to other people; constriction of interests; ability to respond appropriately to supervision; to perform work where contact with others would be minimal; and to perform tasks involving minimal intellectual effort. (Tr. 171) She also stated that Plaintiff had moderately severe limitations in her ability to perform daily activities; understand, carry out, and remember instructions; perform work requiring regular contact with others; perform varied tasks; and to make independent judgments. (Tr. 171) In addition, Dr. Holmstrom opined that Plaintiff was severely limited in her ability to perform intellectually complex tasks; perform repetitive tasks; supervise or manage others; and to perform under stress. (Tr. 171) Dr. Holmstrom also stated that "no improvement in her symptoms can be expected–now or in the future" and "I feel [patient] is physically & mentally unable to maintain gainful employment." (Tr. 171)

On December 6, 2002, Plaintiff saw Dr. Niemer at Low Country Rheumatology. (Tr. 202)

On December 11, 2002, Plaintiff underwent a consultative psychological examination by Al B. Harley, Jr., M.D., Ph.D. in connection with her application for disability benefits. (Tr. 164-167). Examination revealed that Plaintiff had normal intelligence; was oriented; had normal memory; and normal thought processes. (Tr. 165) Her medications were Zanaflex, Prilosec, Seroquel, Arthrotec, Neurontin, hydrocodone, Claritin, Synthroid, Effexor, and Proventil. Dr. Harley also noted that Plaintiff tended to "over-dramatize" and was "flip" emotionally. (Tr. 166)

Dr. Harley opined that Plaintiff suffered from panic attacks, dysthymic disorder, borderline personality, and fibromyalgia, and indicated that her Global Assessment of Functioning was 36.[7] (Tr. 166)  He additionally indicated that Plaintiff was moderately impaired in her ability to relate to others; moderately restricted in her daily activities; and markedly constricted in her thought processes.  (Tr. 166)

On January 17, 2003, Plaintiff saw Dr. Niemer at Low Country Rheumatology and reported increased pain; increased myalgias, fatigue, poor energy, and poor sleep.  He administered Trigger Point injections.  (Tr. 200)

On January 24, 2003, Plaintiff saw Dr. Holmstrom for sharp back pain, jaw pain, head congestion, headache and fatigue.  (Tr. 168)  She was assessed as having sinusitis and allergies, as well as back pain of unknown etiology and an injection of DepoMedrol was administered. (Tr. 168)  On February 12, 2003, Plaintiff again complained of sinus problems and fibromyalgia-type symptoms.  (Tr. 336)

On March 7, 2003, Dr. Niemer noted that Plaintiff could not see Dr. Trouche because he did not accept Medicaid, and referred her to the University of South Carolina Neuro-Psych group.  (Tr. 194)

On March 17, 2003 Plaintiff saw Dr. Holmstrom, who noted a longstanding history of migraine headaches, on right forehead area, associated with nausea & photo phobia, ongoing for years, essentially daily, worse around menses.  She had tried Imitrex, Axert, Maxalt, Zanaflex,

---

[7]    A GAF of 36 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school. 34 Diagnostic and Statistical Manual of Mental Disorders – Text Revision, 4th ed. (DSM - TR VI).

Effexor, Norco, Fioricet, Celebrex, Ergotamines, but none of those had helped to any degree. Now, Plaintiff was interested in a Botox treatment if it might help. She had other headaches associated with sinus disease as well as myofascial syndrome but definitely had distinct migraines. Her medications were Toprol, Effexor, Prometrium (for amenorrhea), and Pepcid.

On March 20, 2003, Dr. Niemer made a referral to USC Neuropsych for Plaintiff's depression and asked for an evaluation. (Tr. 197)

On June 12, 2003, Dr. Niemer wrote an order for ultrasound, massage, and a TENS unit. (Tr. 190)

On July 16, 2003, Plaintiff saw Dr. Steven Storick for Pain Management. He noted a 47 year old with a chronic history of neck pain and diffuse body pain from fibromyalgia with fairly constant pain at back of neck to top of head, into shoulders; repetitive movements increased her discomfort; she had Physical therapy & denies significant improvement; reports chiropractic treatments caused TIA in past; has multiple trigger point injections which seemed to help to some degree; she also had seen Dr. Thomas Brandt in past who managed her chronic pain problems. Dr. Storick noted that an MRI in 2000 noted central disc protrusion at C4-5 but the scan was of poor quality. Plaintiff's medications were Duragesic, Norco; Zanaflex, Effexor, and Ambien. Dr. Storick's impression was chronic neck, shoulder and headache pain; myofascial pain/fibromyalgia; and cervicalgia. He ordered a repeat MRI. (Tr. 244-245)

On July 22, 2003, an MRI of Plaintiff's cervical spine indicated posterior bulges at C2-3, C3-4, C4-5 and C5-6; degenerative disk disease (DDD) was most noted at C3-4, 4-5 and 5-6. In a comparison with the November 2000 MRI, the impression was stable DDD with the exception of C5-6 which showed a more prominent left paracentral disc bulge. (Tr. 302-303)

On July 31, 2003, Dr. Storick administered an epidural steroid injection. (Tr. 242)

On October 29, 2003, Dr. Holmstrom wrote a "To Whom it may concern" note, stating: "I've been providing care to Ms. McLachlan for some time. In my opinion, she's been permanently and totally disabled since Dec. 8, 2001. I previously have filled out disability and functional capacity evaluation forms or her; I dated them on the date that I filled them out, 10/14/02. However, she's been disabled prior to that time.

On December 3, 2003, a brain MRI indicated "probably [an] old gliosis or lacunar infarction in right cerebellar hemisphere of [questionable] clinical significance.

On January 12, 2004, an MRI of the thoracic spine indicated a minimal degenerative change in thoracic spine with minimal posterior osteophytes. Degenerative changes were more pronounced in lower cervical spine with minimal bulging disc at L1-2. (Tr. 299) Also on that day, an MRI of the lumbar spine indicated a minimal disc bulging but no nerve root impingement; mild facet hypertrophy at lower lumbar region; and minimal right paracentral broad based disc bulging at L1-2 without nerve root impingement. An incidental note was made of min compression deformity of L2 without signal abnormality to suggest acute compression. (Tr. 300-303)

On January 16, 2004, Dr. Storick administered a lumbar epidural steroid injection. (Tr. 324)

On January 23, 2004, Dr. Niemer's exam revealed "fibromyalgia active" with 16 tender points and DDD of the lumbar spine. Plaintiff complained of poor energy and poor sleep. (Tr. 292)

On April 8, 2004, Dr. Niemer noted fibromyalgia; he administered a trigger point injection of Depo-Medrol and found 18 tender points and DDD of the lumbar spine. (Tr. 293)

On June 10, 2004, Plaintiff again saw Dr. Niemer and reported she hurt all over with low back pain and her energy was poor. (Tr. 294)

On October 11, 2004, Plaintiff saw Dr. Niemer, who noted degenerative disc disease, decreased range of motion in her lumbar spine; 18 tender points; FMS still active. He prescribed Cymbalta. (Tr. 295)

On December 7, 2004, Dr. Niemer completed a Physical Capacity Evaluation:

Number of hours in day the patient can:

|  |  |
|---|---|
| Sit | 3 hours |
| Stand | Less than 1 hour |
| Walk | Less than 1 hour |

How long at one time can the patient:

|  |  |
|---|---|
| Sit | 20 minutes |
| Stand | 5 minutes |
| Walk | 5 minutes; |

Medications affecting ability to work: Duragesic patch, Narco t.i.d.

"Unable to work at all"

Diagnoses: Fibromyalgia Syndrome, DDD of the lumbar spine; DDD of the cervical spine. (Tr. 315-316)

On May 3, 2006, Dr. Niemer wrote a letter stating that he first saw Plaintiff on August 30, 2002; she had multiple medical problems; his exam revealed trigger point tenderness in the

classic fibromyalgia distribution; other sources for the symptoms were ruled out; she suffered

from chronic, severe daily pain; and takes chronic narcotics. His opinion was that Plaintiff has

severe fibromyalgia and degenerative disc disease, and she suffers from chronic, severe daily

pain. She has required the use of chronic narcotic medications for the pain. The depression is

worsened by the chronic pain and sleep disorder which causes significant fatigue, low energy

and impairment in her memory and concentration. It is my medical opinion that Plaintiff has

significant functional limitations including: (1) the inability to engage in prolonged standing,

walking or sitting; (2) the inability to use her hands for prolonged fine manipulation; (3) she is

unable to bend, stoop, crawl; (4) she would need the freedom to lie down multiple times during

the day; (5) that due to the pain, depression and medications, she is unable to arrive at work in a

timely and punctual manner; (6) the impairments in her concentration and memory are such that

she would be unable to focus sufficiently to complete tasks in a timely manner; and (7) due to

the multiple medical problems and medications, the Plaintiff would miss more that 4 days of

work per month. These impairments have existed since 2001. (Tr. 380).

### B.  Testimony before the ALJ

At the hearing on December 9, 2004, Plaintiff appeared with her former counsel, Steven

M. Calcut, Esquire. (Tr. 381-431) At the beginning of the hearing, Administrative Law Judge

Ben DeBerry (the "ALJ") dismissed the vocational expert, Robert Brabham, stating, "[W]e

running [sic] about an hour behind schedule. And, we're probably going to be involved in that's

hearing [sic] for about an hour to five o'clock. So, I'm going to excuse Mr. Brakman [sic] as a

witness at this time. And if we, and in all probability we will schedule a supplemental hearing

next month in Florence, rather than in Columbia." (Tr. 383)

Plaintiff testified that she was 48 years old at the time of her administrative hearing and married with two dependent children, ages 9 and 17. (Tr. 386) She is a high school graduate with technical training and certification as a cardiac monitor technician, and had past relevant work as a cardiac monitor technician. (Tr. 387-388) She let her driver's license expire in 2004 because she was on a lot of medicine and driving hurt her arms. (Tr. 389) She stopped working in 2001 because her arms hurt so much that she could not lift a chart. Sitting and standing caused her pain. (Tr. 390-383)

Plaintiff's primary physician is Dr. Holmstrom, an internist; she also sees Dr. Brandt, a pain management physician at Kershaw County Medical Center. (Tr. 395) Dr. Fant diagnosed her with fibromyalgia; at the time of her diagnosis, she suffered from severe, constant headaches, shoulder, back, and neck pain; and muscle weakness in her arms. (Tr. 396) She was treated with pain medication (hydrocodone) and muscle relaxers (Zanaflex). (Tr. 397) She also testified that she had received two epidural injections for pain, each of which provided relief for approximately one month. (Tr. 398) She still has cervical pain, in the back of her head. She also has degenerative disc disease and has constant pain. Plaintiff testified that she had pain in her neck, back, legs, elbows, arms, knees and in one of her feet (Tr. 400), and that she had swelling in her legs and ankles and has taken prescription strength pain medication since 1999. (Tr. 401) She felt worse on the day of the hearing than three years earlier (Tr. 401) because her pain level and fatigue level have increased, and her cognitive impairments have increased and she lacks energy. (Tr. 402). Her cervical spine, and lower back hurt more at the time of the hearing than earlier. (Tr. 402) Her prescribed medications caused her to be dizzy, light-headed, and confused (Tr. 403). She also wore a Duragesic patch (100 mg) on her back which caused

open sores and rashes, and took Claritin for asthma and used an inhaler. (Tr. 403-404) She had

trouble with concentration; she first noticed that when she still was working. (Tr. 404) She also

takes Cymbalta for depression. (Tr. 405) She feels despondent and cries a lot. She has crying

spells sometimes every day, and sometimes more often than one a day. (Tr. 406) Her symptoms

interfered with daily accomplishments and she admitted to a history of cancelled appointments

because she cannot manage to get out of bed to get to an appointment. (Tr. 406)

Plaintiff testified that during an average day, she did not get up in the morning but

generally slept through the day, arose at 3:15 p.m. for a short time when her 9 year old returned

from school, spent 5-10 minutes to 30 minutes with her, and then returned to bed (Tr. 407). She

then remained in bed until 6:00 p.m., when she would arise and do a little housework "if [she]

were] not having a real bad day". She goes to bed at midnight or later because sometimes she

cannot sleep. (Tr. 408)

As of the time of the hearing, Plaintiff identified her primary physician as Dr. Niemer.

(Tr. 409) Plaintiff stated that she lifted wet laundry piece by piece, and lifted between 10 and 15

pounds of dry laundry at a time. (Tr. 410) She stopped cooking, shopping, and going to church.

(Tr. 410-411) One friend still calls her. (Tr. 411)

Plaintiff also testified that she has hypothyroidism, irritable bowel syndrome, and is

constantly sick with sinus infections or bronchitis. (Tr. 411) Lastly, Plaintiff testified as to her

various jobs.

At the end of the hearing, the ALJ stated that "we will resume the hearing [in January]

for the primary purpose of taking some vocational testimony[.]" (Tr. 430) However, a

supplemental hearing was never held.  The ALJ issued his decision approximately ten months

later, on October 26, 2005.  (Tr. 13-26)

## III.  ADMINISTRATIVE PROCEEDINGS

The Plaintiff filed an application for SSI and DIB on September 27, 2002 and an

application for DIB on December 17, 2002, and alleging disability beginning December 8,2001.

Plaintiff's applications were denied initially and upon reconsideration by the Agency.  (Tr. 56-

58, 346-348)  A request for a hearing was timely filed January 9, 2004.

As mentioned above, an administrative hearing was held on December 9, 2004, in

Columbia, South Carolina before ALJ DeBerry.  Plaintiff appeared and testified; Robert E.

Brabham, Jr., a vocational expert, was dismissed at the beginning of the hearing.

On October 26, 2005, the ALJ issued a decision denying benefits to Plaintiff.  (Tr. 10-26)

The Plaintiff filed a Request for Review of Hearing Decision/Order with the Appeals Council.

The Appeals Council denied Plaintiff's appeal on August 2, 2006 (Tr. 6-8), thereby making the

ALJ's decision the Commissioner's final decision for the purposes of judicial review.  *See* 20

C.F.R. §§ 404.981, 416.1481.  The Plaintiff has exhausted her administrative remedies, the

parties have briefed the case, and it is now ripe for judicial review under Section 205(g) of the

Act, 42 U.S.C. § 405(g).

## IV.  THE COMMISSIONER'S FINDINGS

In making his determination that the Plaintiff is not entitled to benefits, the

Commissioner has adopted the following findings of the ALJ:

1.  The claimant meets the nondisability requirements for a period of disability and
    Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act
    and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's degenerative fibromyalgia, myofascial pain syndrome, and chronic pain disorder with psychosocial factors are "severe" impairments but that they do not met or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.  The claimant has the following residual functional capacity: lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand or walk 6 hours in an 8-hour work day, and perform other activities of light work.

6.  The claimant's past relevant work as a cardiac monitor technician did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965)

7.  The combined effect of all of the claimant's medically determinable impairments does not prevent the claimant from performing her past relevant work.

8.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.  (20 CFR §§ 404.1520(g) and 416.920 (g)).

## V.  APPLICABLE LAW AND REGULATIONS

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability."  42 U.S.C. § 423(a).  Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1509; *Barnhart v. Walton*, 535 U.S. 212 (2002).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential

questions that are to be asked during the course of a disability determination.  20 C.F.R. §§

404.1520, 1520a; *Heckler v. Campbell*, 461 U.S. 458 (1983); *Walls v. Barnhart*, 296 F.3d 287,

290 (4th Cir. 2002); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).  The five questions are:

> (1) whether the claimant is engaged in substantial gainful activity as defined in Sections 404.1510, 404.1571 et seq., 416.971 *et seq.*  If such determination is affirmative, no disability will be found.  20 C.F.R. §§ 404.1520, 416.920.

> (2) whether the claimant's impairments meet the durational requirement (Sections 404.1509 and 416.909) and are severe (Sections 404.1520(c), 416.920(c)).  If they do not meet those requirements, no disability will be found.  20 C.F.R. §§ 404.1509, 416.909, 404.1520(c), 416.920(c).

> (3) whether the claimant has an impairment which meets or medically equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1) (the "Listing of Impairments") 20 C.F.R. §§ 404.1520(d), 416.920(d).  If one of the listings is met, disability will be found without consideration of age, education or work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).

> (4) whether the claimant has an impairment which prevents past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).

> (5) whether, in light of vocational factors such as age, education, work experience and residual functional capacity ("RFC"), the claimant is capable of other work in the national economy.  The claimant is entitled to disability only if the answer is "no." 20 C.F.R.§§ 404.1520(f), 416.920(f).

An individual may be determined not disabled at any step if found to be:  gainfully

employed, not severely impaired, not impaired under the Listing of Impairments (20 C.F.R. Pt.

404, Subpart P, App. 1), or capable of returning to former work.  In such case, further inquiry is

unnecessary.  If, however, the claimant makes a showing at Step Four that return to past relevant

work is not possible, the burden shifts to the Commissioner to come forward at Step Five and

"prove that the claimant, despite her impairments, can perform a 'significant number of jobs in

the national economy.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (*per curiam)*,

*quoting Walls v. Barnhart*, 296 F.3d at 290.  The Commissioner may meet this burden by relying

on the Medical-Vocational Guidelines (the "Grids") or by calling a vocational expert to testify.

20 C.F.R. § 404.1566. The Commissioner must prove both the claimant's capacity and the job's

existence. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). If an individual is found not

disabled at any step, further inquiry is unnecessary. *See Hall v. Harris*, 658 F.2d 260, 264 (4th

Cir. 1981). Only if the final step is reached does the fact finder consider the claimant's age,

education, and work experience in light of his or her residual functional capacity. *See Hall*, 658

F.2d at 264. Residual functional capacity is a determination, based on all of the relevant medical

and non-medical evidence, of what a claimant can still do despite her impairments; the

determination of the residual functional capacity is the responsibility of the ALJ. *See* 20 C.F.R.

§§ 404.1520, 404.1545-46; SSR 96-8p.

     With respect to the general procedure for determining SSI disability benefits, the

standard consists of a two-fold test: The claimant must show a medically determinable physical

or mental impairment, and the impairment must be such as to render the claimant unable to

engage in substantial gainful employment. *Walker v. Harris*, 642 F.2d 712 (4th Cir. 1981), *citing*

*Blalock v. Richardson*, 438 F.2d 773 (4th Cir. 1972); 42 U.S.C. § 423(d); 20 C.F.R. §

404.1501(b).

## VI.  SCOPE OF REVIEW

     Under the Social Security Act, 42 U.S.C. § 405(g) and § 1383(6)(3), this court's scope of

review of the Commissioner's final decision is limited to: (1) whether the decision of the

Commissioner is supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390,

401 (1971); and (2) whether the Commissioner applied the correct legal standards. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990).

The Court's scope of review is specific and narrow. It does not conduct a *de novo* review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees with it, so long as it is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Smith v. Chater*, 99 F.3d 635, 637 (4th Cir. 1996); *Blalock v. Richardson*, 483 F.2d 773, 775 (4ᵗʰ Cir. 1972). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Barnhart*, 434 F.3d at 653, *citing Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted). At a minimum, "substantial evidence" to support the Commissioner's decision must include: (1) objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; and (4) the claimant's educational background, work history and present age. *Blalock*, 483 F.2d at 776. In reviewing for substantial evidence, the court will not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ. *Johnson v. Barnhart*,, 434 F.3d at 653, *citing Craig*, 76 F.3d at 589 (internal quotation marks omitted). If substantial evidence supports the Commissioner's decision that a claimant is not disabled, the decision must be affirmed. *Blalock*, 483 F.2d at 775. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Johnson v. Barnhart*, 434 F.3d at 653, *citing Craig*, 76 F.3d at 589 (internal quotation marks

omitted); *see also Hays*, 907 F.2d at 1456 (It is the duty of the ALJ reviewing the case, and not

the duty of the Court, to make findings of fact and resolve conflicts in the evidence) *and Smith v.*

*Chater*, 99 F.3d at 638 (the duty to resolve conflicts in the evidence rests with the ALJ, not with

a reviewing court) (citation omitted).  Therefore, if substantial evidence supports the

Commissioner's decision that a claimant is not disabled, the decision must be affirmed.  *Blalock*,

483 F.2d at 775.

## VII.  THE ALJ'S ANALYSIS

Consistent with the five step "sequential evaluation" for the adjudication of disability

claims, the ALJ first found that the Plaintiff had not engaged in substantial gainful activity since

the alleged onset of disability.  (Tr. 25, Finding 2)  At Step Two, the ALJ found that Plaintiff

established that her degenerative fibromyalgia, myofascial pain syndrome, and chronic pain

disorder with psychosocial factors were "severe" impairments.  (Tr. 25, Finding 3)  At Step

Three, the ALJ found that these medically determinable impairments did not meet or medically

equal any of the criteria listed in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1.  (Tr. 25, Finding 3)

Prior to determining at Step Four whether Plaintiff could perform her past relevant work, the

ALJ assessed Plaintiff's residual functional capacity by evaluating the medical evidence and

Plaintiff's subjective complaints (Tr. 16-24), and found that Plaintiff's allegations regarding her

limitations were not totally credible.  (Tr. 25, Finding 5)  The ALJ further found that Plaintiff

retained the residual functional capacity to lift and carry up to 20 pounds occasionally and 10

pounds frequently, stand or walk 6 hours in an 8-hour work day, and perform other activities of

light work.  (Tr. 25-26, Finding 6)  Thus, at Step Four of the evaluation process, the ALJ found

Plaintiff's RFC did not prevent the claimant from performing her past relevant work. (Tr. 26,

Finding 8)[8] The ALJ concluded that Plaintiff was not under a disability as defined in the Social

Security Act, as amended. (Tr. 41, Finding 14)

## VIII.  PLAINTIFF'S OBJECTIONS

The Plaintiff raises four (4) objections in her brief:

1.    **The ALJ's decision is not supported by substantial evidence.**

2.    **The ALJ erred by substituting his own, non-medical judgment for the opinions of multiple treating physicians and psychologists.**

3.    **The ALJ erred as a matter of law in finding that Ms. McLachlan had the function residual capacity to perform her prior work.**

4.    **The ALJ erred by failing to give sufficient weight to the multiple treating physicians' opinions.**

## IX.  DISCUSSION

Under 42 U.S.C. § 405(g), the scope of review limits questions before the Court to (1)

whether the Commissioner's decision is supported by substantial evidence, and, (2) whether the

ultimate conclusions reached by the Commissioner are legally correct under controlling law. *See*

*Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th

Cir. 1990). The scope of review authorized by Congress in § 405(g) is specific and narrow. The

language of § 405(g) precludes a de novo review of the evidence and requires that the Court

uphold the Commissioner's decision, even if the Court disagrees, as long as it is supported by

substantial evidence. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v.*

---

[8]    The Commissioner states, and this Court agrees, that Plaintiff does not dispute the ALJ's findings regarding the first three steps of the sequential evaluation process, but Plaintiff contends that the ALJ erred at Step Four. (Commissioner's Br. at p. 2, n.4.).

*Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Ultimately, it is the duty of the ALJ reviewing

the case, and not the responsibility of the courts, to make findings of fact and resolve conflicts in

the evidence. See *Hays*, 907 F.2d at 1456.

The phrase "supported by substantial evidence" means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390,

401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). "Substantial evidence" has also

been defined as ". . . evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat

less than a preponderance. If there is evidence to satisfy a refusal to direct a verdict were the

case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989

(4th Cir. 1984); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

## DISCUSSION

The Plaintiff has alleged four errors, as set forth above. However, the Court finds that

this case should be remanded for a new hearing because the ALJ's residual functional capacity

("RFC") assessment was improper and not supported by substantial evidence. In addition, this

case should be remanded so that a testimony may be heard from a vocational expert, as initially

was promised by the ALJ.

First, with respect to the RFC assessment, the ALJ found that Plaintiff was able to lift and

carry up to 20 pounds occasionally and 10 pounds frequently, stand or walk 6 hours in an 8-hour

work day, and perform other activities of light work.[9]  (Tr. 25-26, Finding 6)  At Step Four of the

evaluation process, the ALJ found Plaintiff's RFC did not prevent the claimant from performing

her past relevant work.  However, the ALJ does not appear to address the Plaintiff's complaints

of pain, and the number of medications, and their dosages, that she was taking.  Instead, the ALJ

appears in his decision to focus on the "mental or emotional factors" which he believed could

have let Plaintiff to exaggerate her complaints of pain.  (e.g., Tr. 18:  "Often, Pain and other

symptoms, such as those associated with a diagnosis of fibromyalgia or chronic pain syndrome

can be brought about or exacerbated by mental or emotional factors.")

The Court does not find that the ALJ engaged in a meaningful analysis (based upon

evidence of record) of Plaintiff's non-exertional limitations, including pain, and the Court cannot

locate the necessary two-step pain analysis required by *Craig v. Chater*.  Instead, the ALJ stated:

"The evidence indicates that psychologically based problems are the primary source for the

claimant's symptoms of pain, and that those psychologically based problems could reasonably be

alleviated with counseling and other mental health treatment."  (Tr. 23)  It appears to the Court

that the ALJ has substituted his opinion for that of Plaintiff's treating physicians by focusing on

Plaintiff's psychological issues; indeed, the ALJ does not mention that Plaintiff's physicians

treated Plaintiff for pain with oral medications and injections, as well as treated her for

depression.

---

[9]  Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  See 20 C.F.R. § 404.1567(b) (2007).  A job is considered light work when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  See 20 C.F.R. § 404.1567(b).  If someone can perform light work, he also can perform sedentary work. See 20 C.F.R. § 404.1567(b).

As a second reason for remanding the case for a new hearing, the Court finds that the ALJ substituted his opinions for those of Plaintiff's treating physicians, including Dr. Fant, Dr. Holmstrom, Dr. Brandt, and Dr. Niemer. Dr. Holmstrom supplied an evaluation of Plaintiff's physical functional capacity (Tr. 342) and her mental functional capacity (Tr. 344, 170 ), which was far more limiting than the ALJ's determination of RFC. Dr. Niemer, Plaintiff's primary physician since 2003, completed a physical capacities evaluation on December 7, 2004, which set forth greater physical limitations for Plaintiff than those found by the ALJ.

Under 20 C.F.R. § 404.1527, the opinion of a treating physician is entitled to more weight than the opinion of a non-treating physician. Under Section 404.1527, if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must then consider the weight to be given to the physician's opinion by applying five factors identified in the regulation: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(d)(2)(i-ii), and (d)(3)-(5).

The Court cannot locate this analysis in the ALJ's decision.

In addition, Dr. Harley, a state consultative psychiatrist, stated that Plaintiff's GAF was 36. The ALJ dismisses Dr. Harley's opinion (Tr. 23-24) and does not mention the significance of Plaintiff's GAF score.

Finally, the Court finds it appropriate to remand this case for a new hearing because the ALJ stated at the hearing that the hearing would be reconvened at a later time in order to receive testimony from a vocational expert. The new hearing should include the testimony of a vocational expert.

## RECOMMENDATION

Based upon the foregoing, it is recommended that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and the case be remanded to the Commissioner for another hearing, at which time the Administrative Law Judge should obtain the testimony of a vocational expert. In addition, the Commissioner should engage in a continuation of the sequential evaluation process through Step Five, and also provide a proper RFC assessment.

George C. Kosko
UNITED STATES MAGISTRATE JUDGE

December 5, 2007

Charleston, South Carolina